**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **F.E.I. COMPANY,** | : | |
| **Plaintiff** | : | **No. 1:16-cv-02237** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **UNITED STATES OF AMERICA,** | : | |
| **Defendant** | : | |

## MEMORANDUM

On November 4, 2016, Plaintiff F.E.I. Company ("Plaintiff") commenced this Federal

Tort Claims Act ("FTCA") action alleging that the United States of America negligently initiated

the detention of approximately one million pounds of food products in Plaintiff's cold-storage

facility and continued that detention for many months after the permitted 20-day detention period

had ended, causing Plaintiff to suffer over $2 million in damages. (Doc. No. 1.) Following

nearly two and a half years of litigation, the Court conducted a bench trial on Plaintiff's

negligence claim in late April of 2019. This memorandum constitutes the Court's findings of

fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## I. FINDINGS OF FACT AND PROCEDURAL BACKGROUND

### A. Plaintiff's Cold-Storage Facility at 1125 Berryhill Street in Harrisburg, Pennsylvania

Plaintiff owned and operated a cold-storage facility at 1125 Berryhill Street in

Harrisburg, Pennsylvania from the early 2000s through 2018. Plaintiff completed extensive

renovations on the approximately-25,000-square-foot facility in the mid-2000s. Plaintiff's

facility served as a cold-storage facility for its customers' food products, functioning as a

stopover point between the products' place of production or slaughter and the homes or

businesses of the product owners' customers. Plaintiff strived to maximize profits through the

efficient use of its storage space and the rapid movement of food products in and out of the facility. Plaintiff's customers included, inter alia, American Gold Label Foods ("AGL"), Empire Kosher Poultry ("Empire"), JDT Slaughterhouse ("JDT"), Kuyahoora Valley Acres ("Kuyahoora"), LA Foods, Propak Frozen Foods ("Propak"), and Sygma Network ("Sygma"). (Gov. Ex. 22.) In late October of 2013, about half of the pallets at Plaintiff's facility contained USDA-regulated food products, and about half of the pallets contained non-USDA-regulated food products. (Id.)

**B.      Events Preceding USDA Involvement**

Timothy Baumert ("Mr. Baumert"), the owner of JDT, testified that in July or August of 2013, his company transported a load of its food products from Plaintiff's cold-storage facility to a customer in New York City. The customer refused the entire load upon encountering a strong ammonia smell when the doors to the truck were opened, and Mr. Baumert had the food products shipped back to Plaintiff's facility in Harrisburg so that they would remain frozen until he could determine how to deal with them. Mr. Baumert testified that Plaintiff did not inform him of an ammonia leak at Plaintiff's cold-storage facility prior to Mr. Baumert's customer rejecting the load of JDT food products due to the ammonia smell. A letter from Plaintiff's owner, Paul Winer ("Mr. Winer"), to Mr. Baumert indicates that Plaintiff disputed whether there was an ammonia leak at its facility and noted that no other customers had complained of an ammonia smell on their products. (Gov. Ex. 87.)

On October 10, 2013, Plaintiff's contract refrigeration servicer, Refrigerated Services Engineering ("RSE"), removed ice from a frozen drain pan in the facility's freezer. On Friday, October 18, 2013, Plaintiff's warehouse manager asked RSE to return to the facility because a leak indicated that the drain pan was frozen again. RSE arrived at the facility and performed

maintenance to address the leak and frozen drain pan. RSE then informed Plaintiff's warehouse manager that the problem was resolved and left the facility. When Plaintiff's warehouse manager entered the freezer later that afternoon, he smelled ammonia. When RSE was notified of the ammonia smell, it indicated to the warehouse manager that it would address the problem over the weekend. RSE's owner and Mr. Winer communicated over the weekend regarding the situation, and Mr. Winer believed the situation had been resolved.

Upon entering the facility on the morning of Monday, October 21, 2013, Plaintiff's warehouse manager noticed a strong ammonia smell. The warehouse manager informed Mr. Winer of the smell, and Mr. Winer instructed him to close the facility for the day and arrange for RSE to return to the warehouse as soon as possible to address the apparent leak. Mr. Winer subsequently flew from California to Harrisburg, arriving on the morning of October 23, 2013. That afternoon, Empire's president sent Mr. Winer an email, in which he voiced Empire's concern over the impact of the ammonia leak on its products in Plaintiff's facility, as well as Empire's concern regarding Plaintiff's failure to contact Empire regarding the ammonia leak. (Gov. Ex. 83.)

### C. USDA Involvement

On Thursday, October 24, 2013, Dr. Kristen Gentzel ("Dr. Gentzel"), a USDA employee, emailed several USDA Food Safety and Inspection Service ("FSIS") employees—including James Borda ("Mr. Borda"), the northeast regional director for the Compliance and Investigations Division of the USDA Food Safety Inspection Service, and Joseph Priore ("Mr. Priore"), the then-supervisory investigator of the Compliance and Investigations Division—relaying information she had received indicating that an ammonia leak had occurred at Plaintiff's cold-storage facility. (Gov. Ex. 19.) She reported that members of management at Empire—one

of Plaintiff's customers—had indicated to her that Empire's employees had received a shipment of pallets of food products from Plaintiff's facility on the morning of Wednesday, October 23, 2013 and detected a strong odor of ammonia coming from the food products upon arrival at Empire's facility. (Id.) Dr. Gentzel also reported that Empire management informed her that testing indicated that the food products that came from Plaintiff's facility contained ammonia at a level of 100 parts per million, and that when Empire employees visited Plaintiff's facility, testing indicated the presence of ammonia in the main warehouse area and on the loading dock. (Id.)

Mr. Priore then reported the information from Dr. Gentzel's email to three USDA investigators—Michael Ronczka ("Mr. Ronczka"), Robert Simms ("Mr. Simms"), and Christopher Molloy ("Mr. Molloy")—and directed them to travel to Plaintiff's facility. When the investigators reached the facility, they received instructions from Mr. Borda and Mr. Priore to enter the facility and investigate. Upon entering Plaintiff's facility, the investigators smelled ammonia and observed two large circular fans positioned to blow air out of the facility through open doorways.[1] The investigators then walked to the facility's office, where they identified themselves to the warehouse manager and Mr. Winer. After the warehouse manager explained the events leading up to the ammonia leak, the investigators inspected the freezer area, where the ammonia leak was located. Mr. Ronczka observed that the ammonia smell was stronger in that area than in the rest of the facility. After inspecting the facility, the USDA investigators went to the parking lot and had a conference call with Mr. Borda and Mr. Priore. During that call, the investigators described their observations of the ammonia smell throughout the facility. Collectively, Mr. Borda, Mr. Priore, and the investigators then decided to detain the USDA-regulated products at the facility. The investigators subsequently applied a red detention tag to

---

[1] Mr. Simms described the ammonia smell as "VERY strong" in an email sent to Mr. Priore from the facility on the afternoon of October 24, 2013. (Pltf. Ex. 5.)

the outside of the facility's freezer, took photographs of the facility, gathered a list of the owners of the detained products, and interviewed Mr. Winer and Plaintiff's warehouse manager. The resulting detention applied to 776 pallets, totaling approximately 985,000 pounds of USDA-regulated food products.[2]  (Pltf. Ex. 3.)

Following the commencement of the detention of the USDA-regulated food products at Plaintiff's facility, the USDA began to communicate with the owners of the detained food products about developing disposition plans in regard to their products.[3]  (Pltf. Ex. 3.) Throughout early November of 2013, USDA officials researched the history and existing literature regarding food product exposure to ammonia (Pltf. Exs. 12, 14, 26) and contemplated recommending the seizure of the food products detained at Plaintiff's facility (Pltf. Ex. 13). During this period, USDA officials also received proposed disposition plans from several owners, discussed those proposals amongst themselves, and provided feedback regarding the sufficiency of the proposals.  (Pltf. Exs. 16, 18, 23, 27.)  Through November 19, however, no approved written disposition plans were in place.  (Pltf. Ex. 3.)  On November 17, 2013, Mr. Borda emailed other USDA officials indicating that he intended to begin the process to seize the detained food products.  (Pltf. Ex. 32.)  On November 19, 2013, Mr. Borda sent a

---

[2] The owners of these detained food products were AGL, Empire, JDT, Kuyahoora, LA Foods, Propak, and Sygma.  (Gov. Ex. 22.)

[3] Pursuant to FSIS Directive 8410.1, Revision 5:

> Program personnel are to notify the owner, owner's agent, or custodian that he or she may submit a proposal for the adequate voluntary disposition of the violative product.  The proposal should include (1) whether violative product will be moved for reinspection or disposal, (2) how the move will be accomplished, and (3) what corrective and preventive measures the owner, owner's agent, or custodian will take.

(Pltf. Ex. 98.)

recommendation for seizure pertaining to the detained food products at Plaintiff's facility to the USDA's Enforcement and Litigation Division. (Pltf. Exs. 33, 34.) Mr. Borda emailed Mr. Winer on November 20, 2013, indicating that the USDA was moving forward with the seizure of the food products detained in Plaintiff's facility. (Pltf. Ex. 35.)

On November 20, 2013, the USDA approved Empire's disposition plan. (Gov. Ex. 43.) The detained Empire food products were removed from Plaintiff's facility and destroyed between November 21 and 22 of 2013. (Pltf. Ex. 3.) Kuyahoora and LA Foods removed their food products from Plaintiff's facility on November 22, 2013 and November 27, 2013, respectively. (Id.) By early January of 2014, Sygma's products were no longer at Plaintiff's facility. (Id.) In late May of 2014, Propak indicated that it intended to voluntarily dispose of its detained products, but Plaintiff stated that it would not pay for the destruction or permit the release of Propak's detained products until Propak paid Plaintiff for outstanding storage fees. (Pltf. Ex. 70.) In late July of 2014, AGL's vice president indicated in an email to Mr. Priore that AGL intended to destroy its detained food products voluntarily. (Pltf. Ex. 76.) On September 30, 2014, Mr. Winer wrote to Mr. Borda to request a letter from the USDA because Plaintiff planned to have a landfill company dispose of the remaining food products the following week. (Pltf. Ex. 88.) At that time, AGL's, Propak's, and JDT's products remained at Plaintiff's facility. In mid-October of 2014, Mr. Winer exchanged emails with USDA officials regarding whether he needed any specific paperwork either to destroy the remaining detained products or to return them to their owners. (Pltf. Ex. 90.) AGL's, Propak's, and JDT's detained products remained at Plaintiff's facility until April of 2015.[4] At no point during the detention period were any food products at Plaintiff's facility seized by the USDA.

---

[4] This date is based on the testimony of the Government's expert witness, Mr. Dennis King ("Mr. King"). Mr. King testified that because Plaintiff "continued charging JDT up through April [of]

Plaintiff filed the above-captioned action on November 4, 2016, alleging one count of negligence against the Government and seeking over $2 million in damages. (Doc. No. 1.) On March 25, 2019, the Government filed a motion in limine to exclude or limit the expert testimony of Dr. Catherine Adams Hutt ("Dr. Hutt"). (Doc. No. 49.) After both parties filed proposed findings of fact and conclusions of law (Doc. Nos. 48, 51), the Government filed objections to Plaintiff's proposed findings of fact and conclusions of law (Doc. No. 53), and Plaintiff filed objections to and a motion to strike in part the Government's proposed findings of fact and conclusions of law (Doc. No. 56). On April 23, 2019, the Court conducted a bench trial, which concluded on April 30, 2019. On May 16, 2019, the Court ordered additional briefing on the topic of the duty element of Plaintiff's negligence claim (Doc. No. 63), which the parties submitted in June and July of 2019 (Doc. Nos. 66-68).

## II.     DISCUSSION

### A.      The Government's Motion in Limine

On March 25, 2019, the Government filed a motion in limine to exclude or limit the expert testimony of Dr. Hutt (Doc. No. 49), and a brief in support thereof (Doc. No. 50). Plaintiff filed a brief in opposition to the Government's motion on April 8, 2019 (Doc. No. 52), which included a response from Dr. Hutt (Doc. No. 52-1). The Government also raised and renewed its objection to Dr. Hutt's testimony at trial.

The Government contends that Dr. Hutt is not qualified to offer an expert opinion regarding ammonia adulteration and that her opinion lacks a reliable foundation. (Doc. No. 50 at

---

2015," he "made the assumption that the AGL, Propak, and JDT pallets were [] detained through April of 2015." Neither party has objected to the accuracy of this date, and the record is otherwise silent as to the exact date that the AGL, Propak, and JDT food products were removed from Plaintiff's facility.

5-14.)  It first argues that although Dr. Hutt is qualified to offer expert opinions in food science, food safety, and nutrition generally, she is not qualified to offer expert testimony on ammonia adulteration because she lacks academic or professional experience dealing with ammonia adulteration or the use of ammonia in food.  (Id. at 6-9.)  The Government next argues that based on Dr. Hutt's expert report, her opinion regarding ammonia adulteration lacks a reliable foundation.  (Id. at 9-14.)  To that end, the Government attacks the sources relied upon in Dr. Hutt's expert report, including a non-peer-reviewed article from the industry-funded International Food Information Council ("IFIC") and a webpage from the website of Beef Products, Inc., a meat processing company.  (Id. at 11-12.)  The Government asserts that these sources are not reliable bases for an opinion on ammonia adulteration.  (Id. at 13-14.)

In response, Plaintiff argues that Dr. Hutt's experience regarding ammonia adulteration in both the private and public sectors renders her qualified to offer expert testimony regarding ammonia adulteration.  (Doc. No. 52 at 6-7.)  Plaintiff further argues that Dr. Hutt's expert opinion rests on a reliable foundation.  It defends Dr. Hutt's reliance on an article published by industry-funded IFIC and notes that the citation to the Beef Products, Inc. website actually referred to the findings contained in a World Health Organization document.  (Id. at 8-11.)

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  See Fed. R. Evid. 702.  Rule 702 states, in relevant part:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)    The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    The testimony is based on sufficient facts or data;
>
> (c)    The testimony is the product of reliable principles and methods; and

> (d)     The expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  As the United States Court of Appeals for the Third Circuit has explained, "Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit."  See Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003).  The rules impose an obligation on district court judges to act as "gatekeepers" to ensure that an expert witness's testimony meets those three threshold requirements before consideration by a jury.  See Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999); Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993).  In fulfilling its obligation as a gatekeeper, a court exercises discretion when deciding whether to admit or deny expert testimony.  See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146-47 (1997).

When considering the qualification requirement, a court must discern whether a purported expert has specialized knowledge in a given field.  See Pineda v. Ford Motor Co., 520 F.3d 237, 244 (3d Cir. 2008).  In undertaking this inquiry, no particular background or credentials are necessary to establish the requisite specialized knowledge because "a broad range of knowledge, skills, and training qualify an expert."  See In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741 (3d Cir. 1994); see also Waldorf v. Shuta, 142 F.3d 601, 627 (3d Cir. 1998) (noting that a proposed expert witness's generalized knowledge or practical experience may be sufficient to qualify him as an expert).  While the Third Circuit has instructed that a court must "eschew[ ] imposing overly vigorous requirements of expertise," the determination of whether an expert is qualified to testify about a particular topic has not been reduced to a mere formality. See Voilas v. Gen. Motors Corp., 73 F. Supp. 2d 452, 456 (D.N.J. 1999) (internal quotation marks omitted) (quoting United States v. Velasquez, 64 F.3d 844, 849 (3d Cir. 1995)).  Indeed,

"the determination of whether an expert is qualified to testify about a particular topic is predominantly a fact-specific question governed by the unique circumstances in each case." See id.

As for the reliability requirement, the United States Supreme Court has held that the gatekeeping function requires the trial court to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." See Kumho Tire, 526 U.S. at 152. To meet this requirement, "a litigant has to make more than a prima facie showing that his expert's methodology is reliable . . . [but] the evidentiary requirement of reliability is lower than the merits standard of correctness." See Pineda, 520 F.3d at 244. The expert's opinion "must be based on the methods and procedures of science rather than subjective belief or speculation." See In re TMI Litig., 193 F.3d 613, 670 (3d Cir. 1999) (citing Kannankeril v. Terminix Int'l, 128 F.3d 802, 806 (3d Cir. 1997)). "The focus is not upon the expert's conclusions, but rather upon his methodology; the issue is whether the evidence should be excluded because the flaw is large enough that the expert lacks good grounds for his or her conclusions." In re Paoli R.R. Yard PCB Litig., 35 F.3d at 746. When evaluating the reliability of a witness's methodology, a court is guided by several familiar factors drawn from Daubert:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

In re Paoli R.R. Yard PCB Litig., 35 F.3d at 742 n.8. These factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." See Kumho Tire, 526 U.S. at 150. Accordingly, the Rule 702 inquiry is a flexible one, and a court should also take into account any other relevant factors. See Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316, 321 (3d Cir. 2003).

A third requirement, which pertains to fit, requires "the expert's testimony [to be] relevant for the purposes of the case and . . . [to] assist the trier of fact." See Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003). "Rule 702's helpfulness standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." Daubert, 509 U.S. at 591-92. Indeed, testimony from an expert who renders an opinion based on factual assumptions not present in the case or who opines on a matter that does not relate to a disputed issue is not relevant, and, thus, will not assist the trier of fact, as required by Rule 702. See id. For example:

> The study of the phases of the moon . . . may provide valid scientific "knowledge" about whether a certain night was dark, and if darkness is a fact in issue, the knowledge will assist the trier of fact. However (absent creditable grounds supporting such a link), evidence that the moon was full on a certain night will not assist the trier of fact in determining whether an individual was unusually likely to have behaved irrationally on that night.

Id. Like the typical relevance inquiry, the standard for analyzing the fit of an expert's analysis to the case at hand is "not that high." See United States v. Ford, 481 F.3d 215, 219-20 (3d Cir. 2007) (quoting In re Paoli R.R. Yard PCB Litig., 35 F.3d at 745). However, expert testimony can be powerful and misleading because of the difficulty in evaluating it, and the Third Circuit has cautioned that "district courts should tread carefully when evaluating proffered expert testimony, paying special attention to the relevance prong of Daubert." See id. at 219 n.6.

Upon consideration of the parties' submissions and Dr. Hutt's qualification testimony at trial, the Court concludes that Dr. Hutt is qualified to offer expert testimony on the subject of ammonia adulteration of USDA-regulated products.  Notably, Dr. Hutt possesses significant academic credentials in the areas of food safety and nutrition, extensive professional experience in the public and private sectors relating to food safety, nutrition, and the interaction between food products and ammonia, and keen demonstrated knowledge and understanding of the field of literature regarding the interaction between food products and ammonia.  In reaching this conclusion, the Court finds that Dr. Hutt's testimony meets the <u>Daubert</u> thresholds of qualification, reliability, and fit.  Accordingly, the Court will deny the Government's motion <u>in limine</u> to exclude or limit the expert testimony of Dr. Hutt.

### B.    Discretionary Function Exception

"The FTCA waives the federal government's sovereign immunity with respect to tort claims for money damages."  <u>Baer v. United States</u>, 722 F.3d 168, 172 (3d Cir. 2013).  However, the discretionary function exception places a limitation on that waiver by eliminating jurisdiction over "claims based upon the exercise of a discretionary function on the part of an employee of the government."  <u>See</u> <u>id.</u> (citing 28 U.S.C. § 2680(a)).  Specifically, sovereign immunity is maintained as to:

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).

The Supreme Court has endorsed a two-part test to determine whether the discretionary function exception applies to a claim. See Baer, 722 F.3d at 172 (citing Berkovitz v. United States, 486 U.S. 531, 536 (1988)). First, a court must determine whether the challenged action "involves an element of judgment or choice" on the part of the acting government employee. See Berkovitz, 486 U.S. at 536. This prong is not satisfied when a statute, regulation, or policy prescribes a specific course of action for a government employee to take, so that an appropriate decision by the employee does not involve the employee's judgment or discretion. See id. Second, a court must determine "whether the judgment exercised 'is of the kind that the discretionary function exception was designed to shield.'" See Baer, 722 F.3d at 172 (quoting id.). In making this determination, a court must keep in mind the basis for the discretionary function exception—"Congress' desire to 'prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort'"—and consider whether the judgment implicates "considerations of public policy." See Berkovitz, 486 U.S. at 536-37 (quoting United States v. S. A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 814 (1984)).

The Court concludes that the USDA's initial decision to detain the food products in Plaintiff's cold-storage facility is covered by the discretionary function exception.[5] Under the

---

[5] Plaintiff's objections to the Government's proposed conclusions of law regarding the discretionary function exception (Doc. No. 56) are overruled. The discretionary function exception is applicable to the Government's initial decision to detain for the reasons discussed infra. Although Plaintiff also objects to the application of the discretionary function exception to the continuation of the detention after 20 days, the Government has clarified that it is advocating the application of the discretionary function exception only to its initial decision to detain. The Court further notes that while it has taken Plaintiff's remaining objections (Doc. No. 56) and the Government's objections to Plaintiff's proposed findings of fact and conclusions of law (Doc. No. 53) under consideration in arriving at its findings of facts and conclusions of law, such objections are also overruled. Additionally, Plaintiff's motion to strike specific proposed findings of fact offered in the Government's proposed findings of fact and conclusions of law (Doc. No. 56) is denied because only pleadings are subject to the Court's discretion to strike

first prong of the discretionary function test, the Court finds that the decision of Mr. Borda, Mr. Priore, and the on-site USDA investigators to detain the food products at Plaintiff's facility involved an element of judgment or choice. FSIS Directive 1084.1, Revision 5 provides that detention of USDA-regulated food products is "warranted" in several scenarios, one of which is when personnel have "reason to believe" that the food products have been adulterated. (Pltf. Ex. 98.) Although this directive provides a general standard for USDA employees to follow when determining whether to detain food, it does not provide a specific course of action that employees must follow in making that determination and thus yields considerable discretion to USDA employees in determining whether detention is appropriate. See Shea Homes L.P. v. United States, 397 F. Supp. 2d 1194, 1199 (N.D. Cal. 2005) ("[H]owever, this language does not prescribe a specific course of action that must be followed. Rather, it is more in the nature of setting an objective or general standard that must be met without prescribing the particular actions government employee(s) must take to satisfy the standard . . . ."). Accordingly, the first prong of the discretionary function test is satisfied.

Under the second prong of the discretionary function test, the Court finds that the judgment involved in the determination of whether to detain regulated food products is the kind of judgment that the discretionary function exception is meant to shield. As evidenced by Dr. Hutt's expert testimony and the research conducted by USDA employees after the detention decision was made, the existing scientific literature is equivocal as to the exact level at which

pursuant to Federal Rule of Civil Procedure Rule 12(f), and proposed findings of fact and conclusions of law are not pleadings. See Rosewood Cancer Care, Inc. v. Travelers Indem. Co., No. 14-cv-434, 2016 WL 5407731, at *21 (W.D. Pa. Sept. 28, 2016) (citing Polite v. Dougherty Cty. Sch. Sys., 314 F. App'x 180, 184 n.7 (11th Cir. 2008); Bradfield v. Easterling, No. 12-cv-1248, 2016 WL 1242593, at *1 n.1 (W.D. Tenn. Mar. 29, 2016); Burchfield v. CSX Transp., Inc., No. 07-cv-1263, 2009 WL 1405144, at *8 (N.D. Ga. May 15, 2009)). The Court notes, however, that it has taken the arguments raised in Plaintiff's motion to strike under consideration in arriving at its findings of fact and conclusions of law.

ammonia exposure to food products presents health risks to humans, but consumption of food exposed to ammonia has been documented to cause illness under certain circumstances. Regardless of this lack of a clear scientific standard, the decision to detain the food products exposed to an uncertain level of ammonia involved a policy decision by USDA officials that required them to weigh the possible risks to public health against the detriment of removing a substantial number of food products from the market. The Court finds that the judgment involved in that determination implicates the exact type of weighing of public-policy considerations that the discretionary function exception was designed to shield. See, e.g., Naidu v. United States, 93 F. Supp. 2d 577, 581 (D.N.J. 2000) (concluding that the second step of the discretionary function exception was satisfied where the decision in question involved the weighing of the competing interests of public safety and historic preservation). Thus, the second prong of the discretionary function test has been met. Accordingly, the Court concludes that the Government's initial decision to detain the food products at Plaintiff's facility falls within the scope of the discretionary function exception, and Plaintiff's negligence claim premised on that decision is thus barred.[6]

---

[6] Assuming arguendo that the discretionary function exception does not apply, Plaintiff's negligence claim against the Government in regard to the initial detention decision would still fail. The Court concludes, based on the expert testimony of Dr. Hutt, that the field of literature regarding ammonia adulteration is equivocal as to what level of ammonia contamination of food products presents a health risk to humans, but ammonia can be an adulterant to food products under certain circumstances. The initial detention decision is governed by a standard of reasonable belief that the food products were adulterated, pursuant to FSIS Directive 1084.1, Revision 5. (Pltf. Ex. 98.) Upon receiving information regarding the smell and presence of ammonia in the food products shipped to Empire and subsequently observing a strong smell of ammonia at Plaintiff's cold-storage facility, the Government had reason to believe that the food products in the facility were adulterated. Therefore, the Government did not breach any duty to Plaintiff in terms of the initial detention decision. Thus, notwithstanding the Court's conclusion regarding the applicability of the discretionary function exception, any negligence claim relating to the initial detention decision fails due to the lack of a breach of duty on the part of the Government.

C.    **Negligence Under Pennsylvania Law**

Under Pennsylvania Law, in order to succeed on a negligence claim, a plaintiff must prove the following elements: "(1) the defendant owed the plaintiff a duty or obligation recognized by law; (2) the defendant breached that duty; (3) a causal connection existed between the defendant's conduct and the resulting injury; and (4) actual damages occurred." See Sodders v. Fry, 32 A.3d 882 (Pa. Commw. Ct. 2011) (citing Page v. City of Phila., 25 A.3d 471, 475 (Pa. Commw. Ct. 2011)).

1.    **Duty**

Pennsylvania law recognizes a "general duty imposed on all persons not to place others at risk of harm through their actions." See Roche v. Ugly Duckling Car Sales, Inc., 879 A.2d 785, 790 (Pa. Super. Ct. 2005) (internal quotation marks omitted) (quoting J.E.J. v. Tri-County Big Brothers/Big Sisters, 692 A.2d 582, 584 (Pa. Super. Ct. 1997)). "The scope of this duty is limited, however, to those risks which are reasonably foreseeable by the actor in the circumstances of the case." Id. (quoting J.E.J., 692 A.2d at 584).

The Court notes that Plaintiff has placed significant focus on the Government's failure to comply with FSIS Directive 1084.1, Revision 5.[7] However, failure to comply with a federal statute or regulation is not a sufficient basis, on its own, for an FTCA claim. See Cecile Industries, Inc. v. United States, 793 F.3d 97, 99 (3d Cir. 1986) ("[P]laintiffs may not base their

_____

[7] FSIS Directive 1084.1, Revision 5 provides that FSIS officials may "detain products in commerce . . . for a period not to exceed 20 days." (Pltf. Ex. 98.) This directive is consistent with 9 C.F.R. § 329.1, which provides that meat or meat food products may be detained by Department of Agriculture "for a period not to exceed 20 days" if "there is reason to believe that" the meat or meat food products are adulterated and "capable of use as human food." See 9 C.F.R. § 329.1. The Court concludes, based on the evidence presented, that the Government failed to comply with this limit on detention when it continued the detention of food products at Plaintiff's facility after November 13, 2013.

claims [under the FTCA] on alleged breaches of a duty arising solely out of federal law when there is no corresponding duty under state tort law." (quoting <u>Blessing v. United States</u>, 447 F. Supp. 1160, 1186 n.37 (E.D. Pa. 1978)) (internal quotations marks omitted)).  Nevertheless, courts have recognized circumstances under which the failure to comply with a federal statute or regulation does establish duty and breach under Pennsylvania law pursuant to a theory of negligence per se.

Under Pennsylvania law, "[t]he concept of negligence per se establishes both duty and the required breach of duty where an individual violates an applicable statute, ordinance or regulation," but the plaintiff still bears the duty of establishing causation.  <u>See</u> <u>Cabiroy v. Scipione</u>, 767 A.2d 1078, 1079 (Pa. Super. Ct. 2001) (citing <u>J.E.J.</u>, 692 A.2d at 585).  In order to prevail on a claim based on negligence per se:

> (1) the purpose of the statute must be, at least in part, to protect the interest of the plaintiff individually, as opposed to the public; (2) the statute or regulation must clearly apply to the conduct of the defendant; (3) the defendant must violate the statute or regulation; and (4) the violation of the statute or regulation must proximately cause the plaintiff's injuries.

<u>Jordan v. City of Phila.</u>, 66 F. Supp. 2d 638, 644 (E.D. Pa. 1999) (citing <u>Cecile</u>, 793 F.2d at 100.) In order to determine whether one of the purposes of a statute or regulation is to protect a plaintiff individually, other Third Circuit district courts have examined whether the statute or regulation creates a private right of action or otherwise contains rights-creating language.  <u>See, e.g.</u>, <u>Levy-Tatum v. Navient Solutions, Inc.</u>, 183 F. Supp. 3d 701, 708 (E.D. Pa. 2016) (concluding that the Electronic Signatures in Global and National Commerce Act and Pennsylvania's Electronic Transactions Act were not proper bases for negligence per se claims under Pennsylvania law due to their lack of a private right of action or rights-creating language).

Applying such a standard to the directive and regulation at issue in this case, the Court concludes that the first element is not met. Neither FSIS Directive 1084.1, Revision 5 nor 9 C.F.R. § 329.1 provides for a private right of action or contains rights-creating language. Rather, the FSIS directive provides instructions for FSIS personnel to follow when there is reason to believe that USDA-regulated products have been adulterated, misbranded, or are otherwise in violation of pertinent federal law. The directive lacks any language that indicates the creation of rights for those in Plaintiff's situation. Likewise, 9 C.F.R. § 329.1 focuses entirely on the right of the USDA to detain food products under specific circumstances, with no allusion to the creation of a private right of action for members of the public. See 9 C.F.R. § 329.1. Accordingly, FSIS Directive 1084.1, Revision 5 and 9 C.F.R. § 329.1 do not support a claim for breach of duty pursuant to a theory of negligence per se under Pennsylvania law.[8]

### 2. Breach

The Court finds that the Government breached its general duty of care to Plaintiff when it continued to detain the food products at Plaintiff's facility after the twentieth day of detention. Although the Government's failure to comply with the 20-day detention limit imposed by FSIS Directive 1084.1, Revision 5 and 9 C.F.R. § 329.1 does not establish, in and of itself, the breach

---

[8] Plaintiff also alleges various other failures on the part of the Government in connection with the detention of the food products at Plaintiff's cold-storage facility. (Doc. No. 1 ¶ 50.) The Court finds that these alleged failures are either derived from other FSIS directives that, like FSIS Directive 1084.1, Revision 5, are not appropriate bases to establish duty and breach pursuant to a theory of negligence per se because the interest of the plaintiff individually was not their purpose, or do not correspond with any legally cognizable duty. Accordingly, Plaintiff's negligence claim fails to the extent that it seeks to establish duty pursuant to these alleged failures on the part of the Government.

Plaintiff also appears to allege that the Government breached its duty to notify Plaintiff of his administrative appeal rights. (Doc. No. 51 ¶¶ 43-44.) Plaintiff has not provided the Court with any authority imposing such a duty, and the Court is unable to locate any authority to that effect. Accordingly, the Court finds that the Government did not have a duty to notify Plaintiff of his administrative appeal rights, and Plaintiff's negligence claim fails in regard to the Government's alleged breach of such a duty.

and duty elements of Plaintiff's negligence claim pursuant to a theory of negligence per se, as discussed <u>supra</u>, the Court finds that the detention of the food products after 20 days breached the Government's general duty of care to Plaintiff because such action placed Plaintiff at a reasonably foreseeable risk of harm—namely that Plaintiff's use of its cold-storage facility would be inhibited.  The Court further concludes that the Government continued to breach its duty to Plaintiff through April of 2015, when the last of the detained food products were removed and destroyed, and the detention effectively ceased.

### 3. Causation

Turning to causation, the Court looks at two distinct harms purportedly caused by the Government's detention of food products at Plaintiff's facility after the authorized 20-day detention period.  Under Pennsylvania law, a plaintiff must prove "that the defendant's negligence was both the cause-in-fact and the legal, or proximate, cause of her injuries" to prevail on a negligence claim.  <u>See</u> <u>Dalgic v. Misericordia Univ.</u>, No. 3:16-cv-443, 2019 WL 2867236, at *24 (M.D. Pa. July 3, 2019) (internal quotation marks omitted) (quoting <u>Straw v. Fair</u>, 187 A.2d 966, 993 (Pa. Super. Ct. 2018)).  "[A] negligent act is a cause-in-fact of the plaintiff's injuries 'if the harmful result would not have come about but for the negligent conduct.'"  <u>Straw</u>, 187 A.2d at 993 (quoting <u>First v. Zem Zem Temple</u>, 686 A.2d 18, 21 n.2 (Pa. Super. Ct. 1996)).  "[C]onduct is a proximate cause of the plaintiff's harm where the conduct 'was a substantial factor in bringing about the harm inflicted upon a plaintiff.'"  <u>Id.</u> (quoting <u>Jones v. Montefiore Hosp.</u>, 431 A.2d 920, 923 (Pa. 1981)).

First, the Court addresses whether there is a sufficient causal link between the Government's negligent act of detaining the USDA-regulated food products for longer than 20 days and Plaintiff's loss of profits associated with its USDA-regulated customers ceasing to do

business with Plaintiff. The Court finds that Plaintiff has failed to meet its burden of proving that the USDA's continued detention of its products beyond 20 days was a cause-in-fact and legal cause of Plaintiff's loss of business with its USDA-regulated customers. Multiple pieces of evidence lead the Court to conclude that other factors, namely the ammonia leaks at Plaintiff's facility and its communication with its customers regarding those leaks, led Plaintiff's USDA-regulated customers to cease doing business with Plaintiff. For example, in an email to Mr. Winer dated October 23, 2013, the president of Empire expressed Empire's dissatisfaction with its products smelling of ammonia after being stored in Plaintiff's facility and with Plaintiff's failure to contact Empire immediately regarding the ammonia leak at its facility. (Gov. Ex. 83.) Additionally, testimony from Mr. Baumert, the owner of now-defunct JDT, indicates that JDT's decision to cease doing business with Plaintiff was based on Plaintiff's failure to maintain the condition of JDT's products while they were entrusted in Plaintiff's care, rather than any action taken by the Government. Accordingly, the Court finds that the Government's negligence was not a cause-in-fact or legal cause of Plaintiff's loss of its USDA-regulated customers or the associated lost profits, and, therefore, Plaintiff's negligence claim fails to the extent that it is premised on such losses.[9]

Next, the Court concludes that the USDA's post-20-day detention of food products in Plaintiff's facility caused the continued presence of the detained food products in Plaintiff's facility. Accordingly, because Plaintiff's customers would have been able to move their products from the facility and free up that space for Plaintiff to provide its storage services to other customers if the detention had ceased after 20 days, the Court finds that the Government's

---

[9] Because the Court concludes that the Government's negligent actions did not cause Plaintiff's loss of customers and associated lost profits, it need not address the Government's argument that such damages were not reasonably foreseeable (Doc. No. 67 at 10-11).

continued detention caused the lost revenue that providing such services would have generated. The Court, therefore, finds that the Government's negligent actions were both the cause-in-fact and legal cause of such losses, and that the risk of such losses were reasonably foreseeable to the Government under the circumstances it faced.

### 4.    Damages

The Court notes that it has been provided with little evidence that constitutes a basis for calculating damages related to the USDA's detention of food products in Plaintiff's cold-storage facility after the permitted 20-day period.  The most pertinent piece of evidence appears to be Plaintiff's compilation of annual income statements for its cold-storage facility for the years of 2010 through 2017.  (Gov. Ex. 84.)  Although evidence of the number of detained pallets belonging to each customer was introduced, the Court does not have data available regarding revenue or profit per pallet as to any of Plaintiff's customers.  Given the lack of evidence regarding the pallet-by-pallet data and the costs associated with each of Plaintiff's customers, the Court is persuaded that the calculation method proffered by the Government's expert witness, Mr. King, is the most reliable method for determining Plaintiff's damages.  Mr. King's method involves calculating the average monthly revenues from each customer based on pre-detention historical sales data, adjusting those figures for inflation, and then multiplying those amounts by a calculated contribution margin.  The resulting figure serves as a proxy for the losses incurred from the space taken up by the detained food products of each USDA-regulated customer, which Plaintiff could have otherwise used in its normal business operations.  Applying this method to customers JDT, Propak, and AGL, all of which had food products in detention at Plaintiff's

facility until April of 2015, Mr. King's method yields a figure of $43,482 in total losses.[10]

Accordingly, the Court finds that Plaintiff is entitled to $43,482 in damages relating to the

prolonged detention of food products in its cold-storage facility past the twentieth day of

detention.[11]

## III. CONCLUSION

Based on the foregoing, the Court will deny the Government's motion in limine to

exclude or limit the expert testimony of Dr. Hutt (Doc. No. 49), overrule the Government's

objections to Plaintiff's proposed findings of fact and conclusions of law (Doc. No. 53), deny

Plaintiff's motion to strike the Government's proposed findings of fact and conclusions of law

(Doc. No. 56), overrule Plaintiff's objections to the Government's proposed findings of fact and

---

[10] Applying Mr. King's method to the relevant data, the calculated average monthly revenues for AGL, Propak, and JDT were approximately $1,129, $980, and $2,324, respectively, for a total monthly average of $4,433 in revenue from those three customers. For the two-month period of November through December of 2013, the average monthly revenue figure of $4,433 is multiplied by two for a total revenue figure of $8,866, which is then multiplied by the contribution margin of 53.6% (.536) for a 2013 calculation of $4,751 in losses. This same application is repeated for the 12-month period of January through December of 2014 and the 4-month period of January through April of 2015, with adjustments to the revenue figures of 1.5% in 2014 and 1.6% in 2015 to account for inflationary growth. This results in lost profit figures of $28,933 for 2014 and $9,799 for 2015, which leads to the total lost profits calculation of $43,482 for November of 2013 through April of 2015. The Court notes that minor apparent discrepancies in addition or multiplication are accounted for by rounding.

[11] Regarding the detention of the food products owned by Plaintiff's other customers, the evidence indicates that those products were detained for a much more limited period than the products owned by AGL, Propak, and JDT. (Pltf. Ex. 3.) Additionally, Mr. King's figures were calculated for the entire month of November of 2013, even though the permitted detention period of 20 days did not end until November 13, 2013. The Court concludes that this surplus in Mr. King's calculations of the costs related to the detained products of AGL, Propak, and JDT are approximately equal to the costs associated with the short periods of post-20-day detention of the other USDA-regulated customers' food products. Thus, the Court will not modify Mr. King's calculations in order to account for the short post-20-day detention periods of the other customers' food products.

conclusions of law (<u>id.</u>), and direct the Clerk of Court to enter judgment in favor of Plaintiff and against the Government in the amount of $43,482.  An appropriate Order follows.